GENERAL BUILDING CONTRACTORS ASSOCIATION, INC. and Carson Concrete Corporation

v.

CITY OF PHILADELPHIA and Pennsylvania Convention Center Authority.

Civ. A. No. 90–3225.

United States District Court, E.D. Pennsylvania.

April 15, 1991.

John J. McAleese, Jr., John H. Widman, King of Prussia, Pa., for plaintiffs.

Charisse R. Lillie, Philadelphia, Pa., for City of Philadelphia.

Barbara W. Mather, Carl Singley, Valoria L. Cheek, Philadelphia, Pa., for Pennsylvania Convention Center Authority.

## DECISION AND ORDER

BECHTLE, Chief Judge.

### I. FINDINGS OF FACT

1. Plaintiff Carson Concrete Company ("Carson") is a Pennsylvania corporation engaged in the business of concrete construction contracting, with principal offices in Conshohocken, Pennsylvania. Carson is owned and operated by Anthony Samango and Howard Cohen. Plaintiff the General Building Contractors Association ("GBCA") is an association of building construction contractors doing business in the Delaware Valley. Carson is a member of the GBCA. Plaintiff R.M. Shoemaker Co. ("Shoemaker") is a Pennsylvania Corporation engaged in the business of construction contracting with principal offices located in West Conshohocken, Pennsylvania. Plaintiff Carson/Shoemaker is a joint venture formed by Carson and Shoemaker.[1]

2. Defendant Pennsylvania Convention Center Authority ("PCCA") is a public authority created by the Commonwealth of Pennsylvania ("Commonwealth") pursuant to 53 Pa.Stat.Ann. § 16202 et seq. (Purdon 1990) ("Act"). Defendant city of Philadelphia ("City") is a city of the first class organized and operated in accordance with 53 P.S. § 16251 et seq. and the Philadelphia Home Rule Charter.

---

1. One week after commencement of trial of this action original plaintiffs, Shoemaker, and Carson/Shoemaker filed a motion for leave to file an amended complaint and to intervene. The court informed the parties it would take the matter under advisement and the trial resumed. On March 26, 1991, the court entered an Order dismissing the motion without prejudice and indicated that the motion would be reconsidered via its findings of fact and conclusions of law. The court will now grant the motions to amend and to intervene. Defendants are not prejudiced, however, because as is set forth below, the claims of Shoemaker and Carson/Shoemaker have not prevailed.

3. In the early 1980's, the City contemplated the development and construction of a downtown convention center, that would be owned and operated by the City. Pursuant to this purpose, the City retained the Philadelphia Industrial Development Corporation ("PIDC") to begin the project. The PIDC is a not-for-profit corporation that was organized by the City and the Philadelphia Chamber of Commerce to promote economic development.

4. In the mid–1980's, however, the City discovered that it did not have the economic resources to develop the convention center and approached the Commonwealth about assuming the development and construction of the project. In June, 1986, the Act was passed for the purpose of developing, constructing, operating, managing, and owning a convention center in the City.

5. The convention center project site is located between 11th and 13th Streets running east to west, and Arch and Race Streets running north to south. The boundaries of the east block are 11th Street, Arch Street, 12th Street and Race Street. The boundaries of the west block are 12th Street, Arch Street, 13th Street, and Race Street. A viaduct that once carried trains into Reading Terminal ("train shed") is part of the project site and bisects the east block.

6. The PCCA is administered by a board of directors ("Board"). The Board is empowered to exercise all authority to "manage the properties and business" of the PCCA. 53 P.S. § 16211(d). The Board is responsible for making decisions concerning the design and construction of the Convention Center.

7. The Board decided to undertake the development and construction of the project through its own staff and/or with the use of consultants, and did not employ the PIDC. The Board is assisted in its decision-making by various committees. One such committee is the Design and Construction Committee.

8. The Design and Construction Committee monitors the Convention Center's construction activities and formulates policies and strategies relating to the construction of the convention center. The Design and Construction Committee makes recommendations to the Board regarding construction matters. The Design and Construction Committee is comprised of Board members David Brenner, Thomas Gola, Harold Pote; Board Chairman Willard Rouse; Theodore W. Garrison, III, an employee of Morse Diesel/Temple; and Harry Perks, the executive director of the PCCA.

9. The PCCA initially decided to construct the convention center on a multi-prime "fast track" approach. Under a multi-prime approach, the PCCA intended to contract directly with approximately 80 prime contractors. Under the "fast track" approach, the PCCA intended to let bids for certain phases of the work, while plans and specifications were still being prepared on other phases of the work. The PCCA retained the joint venture of Hardin Keating Kemrodco ("HKK") to serve as the construction manager. The construction manager is responsible for coordination of construction under the multi-prime "fast track" approach.

10. The Act required the PCCA to develop and implement an affirmative action plan to assure that all persons were accorded equality of opportunity in employment and contracting by the PCCA, its contractors, subcontractors, assignees, lessees, agents, vendors and suppliers. 53 P.S. § 16205(d). The Act also provided that the PCCA would not be subject to any city laws relating to preferences in regard to employment, contracting, or procurement in the construction and operation of the convention center. 53 P.S. § 16215(d).

*Affirmative action plan*

11. The PCCA retained the Philadelphia Urban Coalition ("Urban Coalition") to draft an affirmative action policy after the Urban Coalition submitted a proposal for the development of a plan to the Board. The Urban Coalition is a private non-profit corporation created to address urban problems, promote racial harmony, and promote intergroup relations. The Urban Coalition acts as an advocate on behalf of disadvantaged communities in Philadelphia and encourages businesses and government to

formulate jointly strategies and programs to address urban problems in Philadelphia. The Urban Coalition also develops affirmative action programs for government agencies and private corporations. Ernest Jones is the executive director of the Urban Coalition. James A. Roundtree is the Urban Coalition's director of economic development projects.

12. The Board adopted the Urban Coalition's affirmative action proposal ("Plan") at its meeting on June 23, 1987. The purpose of the Plan is not to remedy past discrimination but, rather, to ensure that business concerns owned and controlled by minorities and women have the maximum practicable opportunity to participate in the performance of all types of contracts let by the PCCA.

13. The Plan, entitled "An Affirmative Action Plan for the Pennsylvania Convention Center Authority," states:

The fundamental requirement of the Plan is that all contractors, vendors, and consultants, who engage in work for the Authority satisfy the Authority that they have made their "best efforts" to involve in such work as many women and minorities or firms owned by minorities and women as possible. The burden of proving that a "best effort" has been made will be met if the level of participation in any particular phase of the project is deemed to be "meaningful and substantial" under criteria adopted by the Authority after consultation with Philadelphia Urban Coalition. The "best effort" requirement may also be satisfied if it can be demonstrated that "meaningful and substantial" levels of participation are not possible for a legitimate reason. "Meaningful and substantial" shall be interpreted by the Philadelphia Urban Coalition and the Authority as meaning a level of participation which reflects the overall relationship of minorities and women to the general population of the Philadelphia Metropolitan Statistical Area. The authority will consider the availability of *bona fide* minority and women businesses and potential workers in the various areas of contracting or employment opportunities. Participation shall be measured in terms of the actual dollars received by women and minority businesses (except in the case of a minority/female controlled joint venture), and actual hours worked by minority and female workers.

14. According to the Plan, prior to the dissemination of any bid, the PCCA determines what level of minority and/or female participation is meaningful and substantial in the area to be bid. The PCCA must include this information within the bid package along with the names and addresses of *bona fide* minority and female-owned businesses or sources of potential minority and female employees that are available for contracting or hiring opportunities in the area. The Plan requires all bidders to submit within their bids a detailed affirmative action plan listing the names, addresses, dollar amounts, and scope of work to be subcontracted to minority and female owned businesses.

15. If the level of minority and/or female-owned business participation meets or exceeds the level determined by the PCCA to be meaningful and substantial, there shall be a presumption of compliance with the plan. If, however, the proposed level of minority and/or female owned business participation falls below the determined level, the contractor must prove to the satisfaction of the PCCA that, notwithstanding its best efforts, its proposed level of minority and/or female business participation is the best that can be obtained. The Plan measures best efforts by the contractor's outreach efforts, i.e., for example, whether a project bidder has contacted minority and female firms to bid on potential subcontracting opportunities under the contract, has advertised in certain publications concerning subcontracting opportunities, has participated in conferences and seminars designed to solicit minority and female business participation, has utilized the resources offered by the Urban Coalition, and has negotiated in good faith with interested minorities and women.

16. The Plan requires the PCCA to develop a sufficient staffing structure to

carry out the Plan's objectives. The staffing structure shall include an oversight committee, an affirmative action officer, and an affirmative action consultant.

17. Ahmeenah Young is the PCCA's affirmative action director in charge of implementing and monitoring the PCCA's affirmative action policy. As director of affirmative action, Young must make the determination of whether a contractor who falls short of the suggested goals has made its best effort to meet the goals.

18. Young has an extensive background in economic development, management, marketing, and public relations. She has no experience in engineering or construction. In addition to her responsibilities as affirmative action director, Young also serves as director of external affairs. The director of external affairs is responsible for marketing the convention center and acting as a liaison for the convention center. This entails, for example, speaking to community groups that request information on the convention center. Young did not play any role in the development of the PCCA's affirmative action program.

*Application of the Affirmative Action Policy*

19. The Plan defines the terms meaningful and substantial as meaning a level of participation which reflects the overall relationship of minorities and women to the general population of the Philadelphia area. Notwithstanding the language of the Plan, the terms substantial and meaningful have independent definitions.

20. The authors of the Plan intended the term meaningful to qualify the type of work being subcontracted. According to Roundtree, work is meaningful when the subcontractor has control over what it is doing and is the type of work that will help minority and female owned businesses grow and develop their expertise. The determination of what constitutes meaningful work is made at a meeting attended by Ms. Young, a representative from the Urban Coalition, a representative from HKK, and a construction consultant. The Plan does not provide guidelines for making such determinations.

21. The term substantial refers to a quantitative measurement, namely, the actual dollars received by minority and female firms on a particular contract. The Plan requires setting target goals for participation by minorities and women for each contract. Each contract is reviewed individually to set the level of proposed participation. These goals should vary from contract to contract depending on the type of work to be performed and the availability of minority and female subcontractors in those trades.

22. According to Young and representatives of the Urban Coalition, the participation levels are determined by the following process: First the contract is reviewed for the technical specifications and specific work components involved; next, the Urban Coalition surveys the market by looking to various state and local directories as well as its own directories and prepares a list of certified minority and female firms that are qualified and available to perform any of the work components required under the contract; and finally, the dollar value of the work that can be performed by those certified minority and female firms is totalled and divided by the projected dollar value of the contract.

23. For each contract, a representative of the Urban Coalition and the PCCA's affirmative action director meet with the contractors to explain the PCCA's affirmative action policy and to discuss the target goal that is set for that contract. They also arrange meetings with minority and female contractors and provide lists of minority and female contractors that are available to perform the work in particular areas.

24. When submitting a bid, a contractor is required to complete an Affirmative Action Implementation Form that indicates the percentage of the contract that it intends to subcontract to minority and female contractors, the names of those contractors, and the type of work they will perform.

25. If that percentage meets the percentage goal, the contractor is presumed

not to have discriminated. If the percentage provided by the low bidding contractor is less than the target goal set forth in the bid package, the contractor is asked to provide an explanation of the efforts it made to involve minorities and women in the contract and to submit that explanation as part of its bid submission. If a contractor fails to complete an Affirmative Action Implementation Form or fails to provide an explanation in the event it does not meet the target goals, its bid is deemed not responsive.

26. The Urban Coalition first reviews the affirmative action submission to determine whether the contractor has complied with the technical requirements of the plan and makes a recommendation to the PCCA's affirmative action director. The PCCA then conducts an investigation which may include an invitation for the contractor to meet with the PCCA's affirmative action director to further explain the efforts it made to include minorities and women in the work required under the contract.

27. Young makes an initial determination of whether a contractor who has not met the percentage goals has used its best efforts. Young then recommends to the design and construction committee whether or not a bid should be rejected based on her determination. The design and construction committee reviews Young's recommendation, and in turn recommends to the Board whether or not a bid should be rejected.

28. The design and construction committee affords the recommendations of Young extreme deference. The Board affords the recommendations of the design and construction committee extreme deference.

29. Ernest Jones drafted the Plan. Jones testified that "it would be very difficult" for a firm to bid on a contract and have little or no minority participation and still comply with the affirmative action program. Young testified that "it is quite possible" for a contract to be let with no minority or female participation.

*Contract 8907*

30. On January 12, 1990, the PCCA advertised for bids on contract nos. 8905, 8906, and 8907. Bids on these contracts were accepted on March 13, 1990. Contract no. 8905 involved the placement of mechanical piping and plumbing beneath the slab and grade beams to be installed in the west block of the convention center site. Contract no. 8906 involved the placement of electrical conduit and utility boxes beneath the slab and grade beams in the west block. Contract no. 8907 involved the construction of caisson caps, grade beams, concrete slab, and columns in the west and east block.

31. Article XIV of the bid specifications for contract no. 8907 contained the affirmative action requirements. Article XIV plainly states, *"FAILURE TO COMPLY HEREWITH AT THE TIME OF BID SUBMISSION WILL LEAD TO IT BEING DISQUALIFIED FROM BIDDING AND THUS TO REJECTION OF ITS BID."* (emphasis in original). The specifications further state:

> Having surveyed the business participants in the immediate market to determine the local availability and activity of minority and women businesses in areas of work similar to the Work to be performed under the Contract, the PCCA believes that in order for the inclusion in the Bid of subcontract and supplier opportunities for minority and women owned and operated businesses commensurate with the market, the Bid shall provide for such opportunities equal to at least twenty-five percent (25%) for minority business concerns and ten percent (10%) for women business concerns of the value of the bid submitted....

In addition, the Plan requires that a minimum of eighty percent (80%) of the goals for minority and women business concerns be awarded to certified minority and women subcontractors, respectively, and a maximum of twenty percent (20%) of the goal for minority and women business concerns be applied to the purchase of material/supplies from certified minority and women

suppliers, respectively. The specifications also require each bidder to submit an:

Affirmative Action Implementation Plan with its Bid which demonstrates such Bidder's compliance with the PCCA's affirmative action goals. Compliance with such goals may be attained by either (i) demonstrating a subcontractor/supplier and employment plan in the above proportions or (ii) describing such plans as the Bidder shall fulfill and giving the reasons why the Bidder cannot meet the goals suggested by the PCCA, including a detailed description of the efforts the Bidder has made to attempt to reach the PCCA's goals. Satisfactory compliance, as determined by the PCCA, will qualify the Bidder's Bid to be considered. Thereafter, the PCCA's determination of which Bid is acceptable will be based on a determination as to who is the lowest responsible responsive Bidder.

32. Carson submitted a bid on contract no. 8907. Carson's bid provided for twenty-five percent minority participation all under the category of suppliers and zero percent for subcontracting, and two percent female participation under the category of suppliers and zero percent for subcontracting. Carson did not include any explanation of the efforts it had made to contact and request bids from minority and female subcontractors as required in the bid instructions.

33. HKK reviewed Carson's bid to determine whether it was responsive to the requirements of the specifications other than Article XIV and whether Carson was a responsible bidder. HKK concluded that the bid was responsive and that Carson was responsible and, therefore, recommended that the PCCA award contract no. 8907 to Carson.

34. The Urban Coalition reviewed Carson's bid for compliance with the affirmative action requirements. On March 14, 1990, Roundtree wrote a letter to Young stating that the Urban Coalition rejected Carson's affirmative action plan because Carson did not comply with the affirmative action specifications. Roundtree's letter only discussed Carson's failure to meet the specified percentages and did not discuss Carson's best efforts.

35. Jack Rawlings of Hardin Construction Group was HKK's project director assigned by Hardin to the convention center. Michael Preston was HKK's contract manager. Rawlings testified that he became concerned about potential problems with coordinating certain concrete work required under contract no. 8907 with concrete work that was to be bid on another contract. Rawlings was also concerned about potential problems created by additional work brought on by the decision to add an exhibit hall structure on the east block. According to Rawlings, this would require a massive change order on contract no. 8907. In addition, Rawlings testified he became troubled over delays in the demolition of the viaduct.

36. At the time the PCCA sought bids on Contract 8907, the PCCA anticipated demolition of the viaduct commencing in March and having that area of the east block cleared within 60 days. The PCCA could gain possession of the land under the shed and the Reading Company, which owned the shed and the viaduct, could begin demolition of the viaduct only after the PCCA received certification that the shed was clean of PCB or asbestos contamination.

37. On the morning of March 21, 1990, before the weekly Design and Construction Committee meeting, Rawlings and Preston discussed ways these potential construction concerns could be managed. One proposal was to combine the work on contract no. 8907 with the work on contract no. 9001H. Rawlings eventually recommended this proposal to the Design and Construction Committee.

38. At the March 21, 1990 Design and Construction Committee meeting, the committee accepted Rawlings' recommendation to combine the work under contract no. 8907 with additional concrete work in a new contract repackaged as contract no. 9001H. The proposal was recommended to the Board for adoption. The Board adopted the Design and Construction Committee's recommendation. Board members

Rouse, Pote, Gola, and executive director Perks all testified that the decision to combine the work originally bid under contract no. 8907 with additional work under a different contract was made due to engineering and construction concerns.

39. The right to reject the bids on contract no. 8907 was expressly reserved under the bid instructions. On March 23, 1990, Preston notified Carson in writing that its bid on contract no. 8907 had been rejected by the PCCA because it was in the best interest of the PCCA to do so.

*Contract 9001H*

40. The PCCA combined the work under contract no. 8907 with additional elevated concrete slab and column work and the east block exhibit hall D slab work to form contract no. 9001H. Contract no. 9001H was set for bidding on May 15, 1990.

41. Article XIV of contract no. 9001H set forth the affirmative action requirements. Subparagraph A(1) of addendum No. 3 plainly states, "The following requirement is a precondition to submitting a Bid and you are cautioned *THAT FAIL-URE TO COMPLY HEREWITH AT THE TIME OF BID SUBMISSION MAY LEAD TO YOUR BEING DISQUALIFIED FROM BIDDING AND THUS TO REJEC-TION OF YOUR BID.* (emphasis in original). The specifications further state:

Having surveyed the business participants in the immediate market to determine the local availability and activity of minority and women businesses in areas of work similar to the Work to be performed under the Contract, the PCCA believes that in order for the inclusion in the Bid of subcontractor and supplier opportunities for minority and women owned and operated businesses commensurate with the market, the Bid should provide for such opportunities equal to at least fifteen percent (15%) for minority business concerns, and fifteen percent (15%) for women business concerns, of the value of the Bid submitted....

These percentage requirements can only be met through subcontracting. A bidder will not get credit for using minority suppliers.

42. The specifications also require bidders to submit an:

Affirmative Action Implementation Plan with its Bid which demonstrates such Bidder's compliance with the PCCA's affirmative action policies. The PCCA will presume that discrimination has not occurred if the Bidder either (i) demonstrates a subcontracting and employment plan in the above proportions or (ii) describes such plans as the Bidder shall fulfill and gives a detailed description of the efforts the Bidder has made to comply with the affirmative action policies. Satisfactory compliance, as determined by the PCCA, will qualify the Bidder's Bid to be considered. If the PCCA determines that a Bidder has discriminated, that Bid will be deemed non-responsible. Thereafter, the PCCA's determination of which Bid is acceptable will be based on a determination as to who is the lowest responsible responsive Bidder.

43. Bids were opened on contract no. 9001H on June 14, 1990. Carson/Shoemaker, a joint venture between plaintiffs Carson and Shoemaker, was the lowest responsible bidder on the contract. Carson/Shoemaker's bid proposed minority and women business participation equal to .8% of the total bid price.

44. As requested in the bid specifications, Carson/Shoemaker submitted an Affirmative Action Implementation Plan. Attached to the plan was a statement which provided in part:

Carson traditionally performs 95% of its field work with its own forces. Therefore, there is limited opportunity for subcontractor involvement. Nonetheless, to be certain that all minority-owned businesses and women-owned businesses have an equal opportunity to participate in the limited subcontracting of the Joint Venture, Carson has sent a letter to all MBEs/WBEs (listed in the Urban Coalition letter dated 5/18/90) seeking price proposals. In addition, on behalf of the Joint Venture, Shoemaker also solicited proposals from excavators, electricians, miscellaneous metals fabricators and waterproofing contractors.

As of today, the Joint Venture has received 15 proposals from MBEs and WBEs. Of these 15 proposals our bid includes 2 MBEs and WBEs [sic] see the Affirmative Action Implementation Plan for details.

45. The PCCA anticipated having a meeting to discuss Carson's efforts and to discuss certain questions raised by conversations with bidders reflected in the questionnaire. The meeting never took place because the Board decided to pursue prequalification of a general contractor for the construction of the exhibit hall, which included the work contemplated under contract no. 9001H.

*General Contractor*

46. Harry Perks became executive director of the PCCA on March 1, 1990. Perks has close to forty years of engineering and construction experience. During Perks' initial interview with the PCCA, he recommended that the PCCA consolidate its prime contracts to avoid the disadvantages of the multi-prime fast track approach. After Perks was hired, he continued to recommend this approach in subsequent meetings with his staff and in meetings with the Design and Construction Committee. Perks testified at trial as to the disadvantages of the multi-prime approach and the advantages of having one general contractor.

47. According to Perks and other Board members, the use of a general contractor would, among other things, minimize the potential for construction delays, result in better coordination of the various construction components, and be the best means to keep the project within budget. Further, the main advantage of the multi-prime fast track approach (time savings because construction could commence before the plans were complete) no longer existed because the drawings had been completed.

48. Perks made a presentation to the Design and Construction Committee at its meeting in June 1990, outlining the various benefits of employing a general contractor. The Design and Construction Committee reacted favorably to Perks' recommendation and suggested that he raise it with the entire Board. When Perks made a presentation at the June Board meeting, the Board questioned whether a sufficient number of contractors with adequate bonding capacity would be interested in the job. The Board ultimately authorized Perks to explore the interest of general contractors in the project. Perks and Garrison set up a series of meetings with potential general contractors in mid-July to gauge their interest and to encourage them to bid should the Board vote to go forward with bids for a general contract. As a result of those meetings at least four contractors expressed interest in bidding on the project. Perks reported back to the Board at its July 1990 meeting and received the Board's authorization to advertise for the "prequalification of prospective bidders for the construction of the Exhibit Hall structure."

49. Rather than abandon the multiple prime approach at that time, the Board decided to keep open the possibility of pursuing both contract approaches. At that time, Perks was considering assigning the 9001H bids to the general contractor and did not recommend rejecting the bids. After reviewing the specifications for the 9000 series contracts and after their conversations with general contractors, Perks and Garrison determined that the 9000 series contracts should not be assigned because several general contractors would not be interested in bidding on the project if the contract for the important structural concrete work was out of the general contractor's control.

50. Perks conveyed these considerations to the Board during its August 3 executive session and advised the Board members that he wanted to reject all bids on contract no. 9001H. The Board concurred with his judgment and the bids were rejected on August 6, 1990. By letter dated August 7, 1990, Preston informed Carson/Shoemaker that the PCCA has rejected all bids received June 14, 1990 for Bid Package 9001H. The right to reject the bids on contract no. 9001H was expressly reserved under the bid instructions.

51. The PCCA's decision to employ a general contractor was made solely for

business and construction reasons and the Board would have made the same decision absent any affirmative action considerations.

*Shoemaker's General Contractor Claim*

52. The Board decided to proceed with prequalification of general contractors at its public meeting on July 18, 1990. Pursuant to its statutory obligation, the Board advertised publicly for the prequalification of potential general contractor bidders.

53. Shoemaker failed to exercise diligence and pick up bidding materials, or to appeal under a procedure that was set forth in the bid specifications.

## II.  CONCLUSIONS OF LAW

1. Plaintiffs, Carson Concrete Corporation ("Carson"), the General Building Contractors Association ("GBCA"), R.M. Shoemaker, Co. ("Shoemaker"), and Carson/Shoemaker (a Joint Venture), bring this action against the City of Philadelphia ("City") and the Pennsylvania Convention Center Authority ("PCCA"), alleging that the PCCA's minority and female affirmative action program violates federal and state law.

2. Counts one and two allege that the affirmative action program violates the Fourteenth Amendment and request injunctive relief against the City and the PCCA, respectively, permanently enjoining the implementation of the program with regard to specific construction bids; Count three requests monetary relief on behalf of Carson pursuant to 42 U.S.C. § 1983; Count four requests monetary relief on behalf of Carson, Shoemaker, and Carson/Shoemaker pursuant to 42 U.S.C. § 1983; Counts five and six request monetary relief pursuant to 42 U.S.C. § 1981 on behalf of Carson, Shoemaker, and Carson/Shoemaker; and Count seven is a state law claim seeking to enjoin implementation of the program pursuant to 53 P.S. § 16215(a).

3. This court has subject matter jurisdiction by virtue of 28 U.S.C. §§ 1331, 1343(3), and 1343(4) and is exercising pendent jurisdiction over the state claim.

■ 4. A governmental body, such as the PCCA or the City, is prohibited by the Equal Protection Clause from effecting a preference for individuals based upon their race, ethnicity, or gender, unless the purpose for such preferences is to remedy identified discrimination; and then only when the preference is "narrowly tailored" in the case of race and ethnicity and "substantially related" in the case of gender to that remedial purpose. *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Contractors Ass'n of Eastern Pennsylvania, Inc. v. Philadelphia*, 735 F.Supp. 1274 (E.D.Pa.1990).

■ 5. The PCCA's affirmative action plan ("Plan") was not devised to remedy past discrimination. In order to recover monetary damages, plaintiffs needed to establish by a preponderance of the evidence that the Plan was unconstitutional and that Carson's bids on contract nos. 8907 and 9001H were rejected because Carson did not satisfy the Plan's requirements. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

6. Plaintiffs have failed to establish a causal connection between the rejection of Carson's bids and the PCCA's affirmative action program. The court found that the PCCA's rejection of Carson's bids on contract nos. 8907 and 9001H resulted from legitimate construction decisions and that the bids would have been rejected notwithstanding Carson's alleged lack of compliance with the affirmative action requirements. Plaintiffs have not met their burden of proof and, accordingly, their claims for monetary damages must fail.

■ 7. The essence of plaintiffs' claims against the City is that the City imposed a set-aside policy based on race, ethnicity and gender akin to Phila. Code Ch. 17–500 ("17–500"), which this court declared unconstitutional in *Contractors Ass'n of Eastern Pennsylvania, Inc. v. Philadelphia*, 735 F.Supp. 1274 (E.D.Pa.1990), upon the PCCA and other public agencies, authori-

ties and entities, allegedly within its control.

8. It is plaintiffs' burden to show by a preponderance of the evidence that the City imposed a set-aside plan upon the PCCA, and that this action caused plaintiff Carson to lose the contracts in question. Plaintiffs failed to produce sufficient direct, circumstantial, or mixed evidence demonstrating that the City compelled the PCCA to adopt an affirmative action program that required quotas or set-asides similar to 17–500. Plaintiffs' claims against the City were, at best, speculative and attenuated. The court is permitted to draw only those inferences to which the evidence is reasonably susceptible and may not resort to speculation or conjecture. *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F.Supp. 1100 (E.D.Pa.1981). As a result, plaintiffs' claims against the City must fail.

9. 53 P.S. § 16215(a) requires the PCCA to award each contract to the lowest bidder. Plaintiffs seek an affirmative injunction directing the PCCA to award the contracts at issue to Carson. Such relief cannot be granted because plaintiffs have not shown that contracts nos. 8907 and 9001H were rejected because of the application of an unconstitutional affirmative action program or any other improper purpose. Bids on both contracts were rejected pursuant to the PCCA's statutory right to reject all bids on a particular contract. Plaintiffs have not established by a preponderance of the evidence that, notwithstanding Carson's low bid on Contracts nos. 8907 and 9001H, Carson's bids were rejected because of alleged lack of compliance with the PCCA's affirmative action requirements. As a result, plaintiffs' state law claim must fail.

10. Plaintiff Shoemaker failed to establish by a preponderance of the evidence that it was improperly excluded from bidding on the general contractor bidding process. As a result, Shoemaker's § 1983 claim must fail.

## III. DISCUSSION

■ Plaintiffs brought the present action, alleging that despite the PCCA's pronouncements to the contrary, the PCCA's affirmative action plan imposes upon PCCA contracts classifications based on race, ethnicity, and gender. Although plaintiffs have failed to establish by a preponderance of the evidence that the PCCA rejected Carson's bids on contracts nos. 8907 and 9001H because Carson failed to comply with the PCCA's affirmative action requirements, the evidence adduced at trial has not convinced the court that the Plan is a constitutional means of ensuring that minority and women subcontractors have an equal opportunity to secure PCCA contracts. Despite the Urban Coalition's and the PCCA's laudable intentions, the court is not satisfied that the PCCA leadership is sufficiently dedicated to attaining meaningful and substantial minority and female subcontractor participation. The PCCA has failed to commit the necessary resources, including staffing and personnel, to assure that the Plan is implemented in a non-discriminatory manner. Based on the testimony given by various officials of the PCCA and the Urban Coalition, the court concludes that, in certain circumstances, the Plan will be implemented in a manner in which the target goals operate as *de facto* quotas. The court's conclusion stems not from a facial examination of the Plan but, rather, from an examination of the evidence and testimony presented at trial concerning the application of the Plan. The court notes, however, that the PCCA has abandoned its multi-prime contractor fast track approach and has selected a single general contractor to construct the convention center. Inasmuch as it is unclear how the Plan will be applied under the general contractor system, the court finds that the threat of an unconstitutional application of the Plan is, at this time, plainly present but, because the single general contractor approach is now unfolding, the threat is not sufficiently immediate to warrant injunctive relief. By refraining from granting injunctive relief, there is also afforded to the PCCA an opportunity to rectify the Plan's apparent shortcomings, i.e.

assure it is implemented in a constitutional manner, so as to avoid both a deprivation of any person's constitutional rights and future litigation that will further delay the construction of the convention center.

Since the implementation of Title VII of the Civil Rights Act of 1964, government, industry, and public and private institutions have endeavored to ameliorate the effects of past discrimination based on race, gender, and national origin. An integral part of these efforts has been "affirmative action." The phrase "affirmative action" has been traced back to Executive Order 10925, issued by John F. Kennedy in 1964. *See* Jones, *The Genesis and Present Status of Affirmative Action in Employment: Economic, Legal, and Political Realities*, 70 Iowa L.Rev. 901, 906–07. Executive Order 10925 prohibits a contractor from discriminating "against any employee or applicant for employment because of race, creed, color, or national origin" and required contractors to "take *affirmative action* to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin." Exec. Order No. 10925, 3 C.F.R. 448, 451 (1959–1963). (emphasis supplied).

Affirmative action programs seek to ensure that educational and professional opportunities are genuinely and equally accessible to all qualified persons without regard to race, gender, and/or national origin. A traditional characteristic of affirmative action programs has been the use of race or gender based "set-asides" or "quotas." Such methods have been highly controversial because they necessarily place burdens upon individuals due to their nonminority racial status. *See* L. Tribe, American Constitutional Law § 16–22, at 1523 (1988).

Since 1978, the Supreme Court has struggled with issues concerning the appropriateness and validity of government sponsored affirmative action programs which implicate the equal protection clause. *See Regents of University of Cal. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Fullilove v. Klutznick*, 448 U.S.

448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). It was not until *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), that a majority of the Supreme Court agreed on the appropriate level of scrutiny to be applied to voluntary state or local government affirmative action programs. This court thoroughly examined the evolution of the Supreme Court's treatment of affirmative action in *Contractors Ass'n v. Philadelphia*, 735 F.Supp. 1274, 1287–1292 (extracting in part discussion from *Shurberg Broadcasting of Hartford, Inc. v. F.C.C.*, 876 F.2d 902, 910–12 (D.C.Cir.1989)), and it is unnecessary to repeat that discussion here. In *Croson*, the Court held that in order for set-asides or quotas based on race to survive constitutional scrutiny, state or local governments must demonstrate that the plan is "narrowly tailored" to a "compelling interest." *Croson, supra*, 488 U.S. at 505–06, 109 S.Ct. at 727–28. The Court also held that the Richmond, Virginia Minority Business Utilization Plan, which required Prime Contractors to set aside at least 30% of its subcontracting dollars for minority firms, could not meet the strict scrutiny test because the plan was not adopted to remedy "identified discrimination." Likewise, in *Contractors Ass'n, supra*, this court, applying the heightened scrutiny standard set forth in *Croson*, held that the City of Philadelphia's minority and female set-aside program was unconstitutional because it was not sufficiently tied to specifically identifiable evidence of past discrimination.

In the present case, the Urban Coalition and the PCCA, presumably in obedience to *Croson*, attempted to draft an affirmative action plan that was non-discriminatory. The Plan's objective was plainly not to remedy past or existing racial discrimination in the business community but, rather, to ensure maximum participation in future PCCA work for minorities and women in contracting and employment. The PCCA commendably expected to afford equal opportunity to minorities and females without resorting to the use of quotas or set-asides. Toward this end, the Urban Coalition, re-

tained by the PCCA to develop an affirmative action program, created the means of establishing goals in the form of percentages for minority and female subcontractor participation. The PCCA envisioned that the goals would act not as quotas that had to be met, but as an indicator of the levels of participation that the PCCA had determined would be appropriate given the availability of qualified minority and women contractors in the community. The Urban Coalition, the drafter and implementor of the Plan, insists that the percentage goals differ from set-asides and quotas in that the percentages are not requirements that must be met as a condition of being accepted as a contractor. The Urban Coalition contends that all that is required under the Plan is that a prospective contractor make its best effort to meet the goals. Basically, the implementors of the Plan wanted to make sure that majority contractors actually made genuine efforts to locate, and dedicated efforts to ascertain the qualifications of minority and women firms as potential subcontractors. Ideally, a contractor that could satisfy the Urban Coalition and the PCCA that it had in fact made its best efforts but was still unable to obtain meaningful participation by minority and women contractors, could still be deemed to have fulfilled the requirements of the affirmative action plan and be awarded the contract.

For example, the PCCA's affirmative action director, Ahmeenah Young, testified that it was very clear that the Plan was not to include a system of set-asides. Young described the percentages as "target indicators." She testified that, "[i]f a contractor is not meeting somewhere close to that number [target goals], then it tells us we better look to see if there is some discrimination going on, and that's primarily how we are using it." She stated that it is "quite possible" that a contract could be let without any minority or female participation. According to Young's testimony, the target goals are designed to be used as administrative guideposts. If a bidder proposes minority and female participation equal to or above the recommended percentages, the PCCA, without further inquiry, would assume that the contractor has used its best efforts and the PCCA need not spend any additional resources in investigating whether it did in fact use its best efforts. Similarly, the contractor would not be expected to seek out additional minority or female participation, even if it would produce greater participation by such persons. The PCCA and the Urban Coalition declare that the failure of a contractor to meet the proposed percentages is intended to act merely as a signal to the PCCA that the contractor may not have used its best efforts and that additional resources ought to be expended to determine whether best efforts have been made.

The Plan's use of such terms as best efforts, meaningful and substantial, and target goals, however, cannot be permitted to disguise, albeit unintentionally, a system whereby a contractor *must* subcontract a specific percentage of work to minority and female subcontractors. If the PCCA will not allocate the necessary resources to enable it to determine, technically, genuinely, and thoroughly, whether a contractor is discriminating, then the percentage goals necessarily become *de facto* quotas.

The absence of adequate PCCA resources committed to affirmative action would be a convenient and irresistible reason for an affirmative action director to place more (sometimes total) emphasis on the percentages than the drafters of the plan had originally intended. The court fails to see how the PCCA's affirmative action director can thoroughly examine bids on the approximately 80 contracts, covering a myriad of services, skills, and disciplines the PCCA intended to let, in addition to meeting her other extensive marketing responsibilities, and still have time to conduct best efforts investigations. Furthermore, Young is not an engineer and she admitted in her testimony that she has never been closely involved with the construction industry before. Young's personal commitment to the idea of affirmative action and her dedication to act as an effective advocate on behalf of the minority and female community cannot be questioned. The court is skeptical, however, as to

whether it is appropriate for a person who is neither skilled, educated, trained, nor experienced in the intricacies of engineering or construction to be the ultimate authority as to whether a contractor seeking to compete in a multi-disciplined major construction project has made its best efforts to meet pre-set minority and female subcontractor percentages. This is especially so when such a determination will often hinge on whether engineering and construction concerns in fact justify refusals to subcontract to certain businesses, regardless of whether they are minority or female owned.

While it is true that the Board has the formal, final word on whether a bid has complied with the Plan, the court has found the Board to be uninterested in the subtle mechanisms that drive the Plan. The Board has not merely delegated affirmative action responsibilities to Young; it has abdicated the entire subject to her. The following deposition testimony of Harry Perks, the Executive Director of the PCCA, that was read into the trial record, is a fitting demonstration:

"Question: Who decides whether there is meaningful and substantial participation in a bid?

"Answer: I would say the [PCCA] makes that decision. I would say, theoretically, it would be my decision, but generally, I delegate that to Ahmeenah Young.

"Question: How does Ahmeenah Young decide whether a bidder has proposed meaningful and substantial participation?

"Answer: Except for the fact that she has analyses done by the Urban Coalition, I don't know the specifics of that analysis.

(11/20/90 N.T. 181–82).

Plainly, the Board affords Young's recommendations excessively disproportionate deference. The sum total of the knowledge of the executive leadership of the PCCA who testified concerning the affirmative action plan can fairly be said to be embodied in two phrases or slogans, to wit: best efforts and meaningful and substantial participation. Every witness testified that these phrases described what the plan was all about, but they could not concisely define what these terms meant.

The Board's indifference towards affirmative action can be best demonstrated by the testimony of Board member Willard Rouse. In response to the charge that the PCCA's desire to pursue the general contractor route was an attempt to avoid the consequences of the present litigation, Rouse stated:

I want to win this litigation because I think what we are attempting to do and hope and pray what we are attempting to do from an affirmative action policy is constitutional, is being implemented and in fact that we can continue on that course. But I can tell you that, as far as I'm concerned, it is a peripheral issue to building this building on budget, on schedule, and making damn sure it is the finest building in the country. And it had been my intent all along and I can tell you time and time again that I have attempted to force down, for pragmatic reasons, the goals, and in fact encouraged the Urban Coalition, Ahmeenah Young, to accept what were less in percentages than were set as goals, and in fact that occurred—strictly for the pragmatic reasons of executing on this project and making sure that we were doing the things that it took to get it done on budget, on schedule, as best we could control it, and in fact get the best-quality job possible.

(12/3/90 N.T. 165).

This testimony not only alludes to the broad discretion afforded to Young, but also reveals a questionable relationship between the Board's logistic concerns and affirmative action. It is understandable that the Board's first priority is making sure the convention center is built as quickly and successfully as possible. Nonetheless, the court cannot condone a policy that relaxes affirmative action goals whenever budgetary, scheduling and/or construction concerns would make adherence to the goals inconvenient. The PCCA's stated commitment to the goals of the affirmative action policy becomes disingenu-

ous if the amount of deference given to the policy by the Board depends on the logistical ramifications of the Plan's application. Rouse's attitude towards the Plan underscores the Plan's fundamental shortcoming—a lack of a dedicated effort among the leadership of the PCCA to fulfill the Plan's objectives.

The leadership of the PCCA appears to have satisfied itself that it can fulfill its affirmative action obligations by a two-step process. First, by declaring that the Plan requires meaningful and substantial participation by females and minorities; and that the test as to whether this has occurred will depend on whether or not the Board concludes that a contractor has used its best efforts to assure such participation. The second step is to deliver over to Young what is tantamount to the absolute power to decide if a prospective contractor has satisfied these requirements.

There is no evidence that the PCCA has committed or is planning to commit to Young any resources, in the form of financing, bidding or bonding assistance and/or technical assistance relative to facilitating the ability of minority and female subcontractors to participate in the construction of the convention center. No mouthing of meaningful or substantial participation or best efforts will make an otherwise empty affirmative action plan a reality. Ironically, strong dependence upon the percentage device as the central component, or even as a guide, corroborates the lack of lawful features in the affirmative action effort.

Accepting for the moment that the percentages are merely indicators and not quotas or set-asides, removing the percentage component of the Plan should not prevent the Plan from working. There are other means by which the PCCA can ensure that a contractor has taken steps to identify minority and female subcontractors, has provided interested minorities and women with equal access to bidding information, and has made reasonable efforts to negotiate with minority and female owned businesses for specific sub-bids. The PCCA can emphasize other components of the af-

firmative action program, such as enhancing the availability of minority and female contractors by providing extensive technical and financial assistance directly to them, or indirectly through lenders and suppliers. In addition, although the PCCA claims it has actively sought to bring majority and minority and female contractors together, it appears that these efforts have been limited to providing lists to majority contractors of available minority and female subcontractors. There is no evidence showing how the lists are developed, what technical knowledge went into them, whether, or how, they are kept current and the like. The court fails to see why the analysis undertaken by the PCCA when a contractor has not procured the requested levels of minority and female subcontract participation, i.e. the best efforts inquiry, cannot be generated for all bids that are submitted, in place of the potentially discriminating target goals. Moreover, if the Urban Coalition's estimate of the availability of qualified minority and female subcontractors is in fact reliable, the PCCA should be able to secure levels of minority and female participation equal to or greater than the target goals by ardently encouraging each prospective bidder, through specific recommendations, follow-ups, face to face meetings, visits and seminars, to make strong efforts to include these subcontractors. The court is not questioning the PCCA's right to refuse to award a contract to a bidder that is discriminating against minority or female firms. The court is intimating, however, that the PCCA should formally develop, adopt, and then exhaust all non-discriminatory methods of securing minority and female participation before considering the use of methods that are likely to be discriminatory. If best efforts truly only require that contractors give minority and female subcontractors the opportunity and information to bid, conduct good faith negotiations with such subcontractors, and cooperate with the PCCA to seek to overcome obstacles to acceptance, then the percentage goals are meaningless and in some cases counter-productive. If affirmative action is satisfied by a quota schedule, the attainment of the quotas

could very well top off any interest in further efforts that could result in greater participation than the quotas.

A truly well-rounded affirmative action program should consist, in part, of race and gender neutral measures which assist minorities and females in achieving parity with majority competitors. This is certainly not a novel idea. As Justice O'Connor stated in *Croson:*

Even in the absence of evidence of discrimination, the city has at its disposal a whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races. Simplification of bidding procedures, relaxation of bonding requirements, and training and financial aid for disadvantaged entrepreneurs of all races would open the public contracting market to all those who have suffered the effects of past societal discrimination or neglect. Many of the formal barriers to new entrants may be the product of bureaucratic inertia more than actual necessity, and may have a disproportionate effect on the opportunities open to new minority firms. Their elimination or modification would have little detrimental effect on the city's interests and would serve to increase the opportunities available to minority business without classifying individuals on the basis of race.

488 U.S. at 509–10, 109 S.Ct. at 729–30. *See also id.* at 524–28, 109 S.Ct. at 737–39 (Scalia, J., concurring).

Likewise, here, affirmative action assistance in the form of low interest bank loans, relaxation of or assistance with bonding requirements, assistance with facility and equipment rental, including guarantees, the furnishing of temporary or part-time help, instruction, and training, assistance in the form of purchase or rental of tools, equipment, and sub-contract services, including bookkeeping, accounting, and other office support services, are resources that could be made available in an affirmative action program to assist an otherwise capable and willing minority or female enterprise to participate competitively in a contract or work such as that being undertaken by the PCCA. There is no evidence that any of this has or will be made available. Visitation by an affirmative action technical team on behalf of the PCCA with prospective contractors who are genuinely interested in meeting with minority and female contractors to discuss problems such as those addressed is the sort of action that, when put forward, becomes affirmative action. The PCCA may eventually get around to this, but there is no indication in the record that they intend to. In the meantime, they have simply handed over their affirmative action responsibilities to the obviously dedicated, but woefully overworked current affirmative action coordinator, who has no choice but to turn to what effectively amounts to an unconstitutional quota system as a short cut to legitimate means of assuring minority and female participation in the project.

One of the principal dangers in using the quota system simply as a guide or indicator is that its mere existence can lure its implementors into using the percentages in a manner for which they were not intended to be used. This danger is exacerbated when it is unclear among the Plan's implementors precisely how these percentages are to be used. Young suggested that contractors would satisfy the best efforts requirement as long as they undertook genuine efforts to locate and ascertain the qualifications of minority and female subcontractors, regardless of whether they were successful in reaching the recommended percentage levels, assuming, of course, that they did not in fact discriminate. Other witnesses defined best efforts not in terms of a contractor's outreach efforts but in terms of a contractor's success in achieving the required percentages. Ernest Jones, for example, testified that it would be very difficult for a firm to bid on a contract, have little or no minority participation and still be considered as complying with the affirmative action program. If best efforts are measured not in terms of a contractor's outreach efforts but, rather, in terms of its success in meeting the proposed goals, then the goals become quotas. Evidence presented at trial demonstrates this danger. In a letter dated March 14,

1990, James Roundtree informed Young that the Urban Coalition determined that Carson's bid on contract No. 8907 did not meet the affirmative action requirements. The letter stated:

> [t]he [Urban Coalition] rejected the affirmative action plan submitted by [Carson] because it did not comply with the project's specifications.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The affirmative action plan submitted by [Carson] stated a total MBE/WBE participation goal of 27%. They utilized their MBE/WBE firms as suppliers only. To the [Urban Coalition]'s knowledge the firms are contractors not suppliers/vendors.
>
> Total employment hours participation stipulates that at least 35% of the total employment hours comprising each trade shall be performed by minority and/or women workers. Carson listed two trades, carpenters and rodsetters, at 12% and 7% respectively, far below the requested goals.

The wording of this letter plainly suggests that the sole basis for the Urban Coalition's rejection of Carson's bid was Carson's failure to attain the requested minority and female subcontracting participation levels. Nowhere in this letter is there any mention of best efforts and/or meaningful and substantial participation. While it is true that at the trial the Urban Coalition denied that the letter was intended to discuss comprehensively its evaluation process, the letter's narrow focus cannot be ignored.

From a strictly legal viewpoint, it is difficult to tell when the person with the authority to recommend to the Board whether to accept or reject a prospective bidder is making a decision based on the percentage factor on its face or some other subjective factor. This potential poses an unacceptable risk of unlawful decision-making based on race or gender alone.

The evidence offered to date shows that the Plan is long on percentage quotas and attractive phrases, and short on affirmative action. The reliance by PCCA on percentages to assure minority and female participation, to the exclusion of other acceptable

means of achieving those goals, even at this early stage of the project, is unconstitutional behavior waiting to happen. It poses a clear threat of irreparable injury in its present form.

■ The question of whether this threatened harm is sufficiently immediate as to warrant injunctive relief poses a more difficult question. The PCCA initially decided to construct the convention center under a multi-prime fast track approach. Under this method, the PCCA intended to contract directly with the eighty-plus prime contractors needed to complete the project. The multi-prime fast track program permitted construction to begin on some phases of the project while plans and specifications for other phases could continue to be developed. In early 1990, the PCCA began to reevaluate the benefits of this method. The idea began to emerge that the various construction components could be better coordinated, delays could be eliminated, and the entire project kept on budget if one general contractor was used instead of the eighty or so prime contractors. After carefully examining the pros and cons of each method, the PCCA elected to reject the multi-prime format in favor of a general contractor. The PCCA accepted bids for the general contractor just as the trial was completed.

Plaintiffs claim that the PCCA pursued the general contractor format in order to avoid the consequences of the present litigation. To the contrary, the court found that the PCCA's decision to reject the multi-prime approach resulted from its determination that construction of the entire project would be better served by a general contractor. The court also found that the decision would have been made notwithstanding the controversy concerning the affirmative action program.

It is not evident, however, how the PCCA intends to implement its affirmative action program with a general contractor. The court will not speculate as to whether the threat of unconstitutional decision-making will emerge under this new format. While the court believes that the plaintiff has satisfied its burden of proof in establishing

**1212**

that the intended use of percentage goals to achieve racial and gender balance creates a clear threat of irreparable harm to contractors under the multi-prime contractor method, the immediacy of that threat has been removed, for the time being, by the PCCA's change to the general contractor approach. As a result, the court will not issue injunctive relief at this time. The court is not attempting to reformulate the PCCA's affirmative action program. The court is merely holding that the manner in which the Plan has been proffered as implemented to date presents an unconstitutional threat of discrimination against majority contractors.

## IV. CONCLUSION

For the reasons set forth in the foregoing conclusions of law, judgment will be entered in favor of defendants and against plaintiffs. The court will not grant injunctive relief in favor of plaintiffs because, although plaintiffs have established the threat of irreparable injury, that threat is not sufficiently immediate at this time.