**FIRST CAPITAL INSULATION, INC., Plaintiff,**

**v.**

**David L. JANNETTA, Individually and in his capacity as Secretary of the Department of General Services of the Commonwealth of Pennsylvania, Defendant.**

Civ. A. No. 1:CV–91–0123.

United States District Court,
M.D. Pennsylvania.

Feb. 14, 1991.

---

Thomas A. Beckley, John George Milakovic, Beckley & Madden, Harrisburg, Pa., for plaintiff.

Jerome T. Foerster, Office of Atty. Gen., Harrisburg, Pa., for defendant.

## MEMORANDUM

RAMBO, District Judge.

Before the court is plaintiff's motion for a preliminary injunction. On February 8, 1991, a hearing was held to establish whether such an injunction should issue. The matter is now ripe for disposition.

*Background*

Plaintiff First Capital Insulation, Inc. is a firm specializing in the removal of asbestos-containing material from buildings and other structures. In November 1990, the Pennsylvania Department of General Services (DGS) re-solicited bids for an asbestos removal project at Cheney University, a school owned and operated by the Commonwealth of Pennsylvania.[1] First Capital responded with a bid.

Pursuant to the dictates of 4 Pa.Code. § 68.101(a) and (d) and the "Special Requirements" section of the invitation to bid documents, First Capital submitted, along with its bid, a DGS "Solicitation Sheet" and "Commitment Sheet." The solicitation sheet requires that the bidder list each minority owned business enterprise (MBE) and woman-owned business enterprise (WBE) which it contacted to obtain bids for subcontracting work. On the commitment sheet, the bidder then lists each MBE and WBE to which it has promised business and in what proportions should the bidder be awarded the state contract. With each job, the DGS, under 4 Pa.Code § 68.101(c) also sets suggested MBE and WBE participation levels for the project: for the Cheney project, 15% of the dollar total of the contract for MBEs, 5% of the total for WBEs.

First Capital submitted a bid, and after the preliminary tabulation, was found to be the lowest bidder. A competitor, American Abatement Group ("American") was the second lowest bidder. First Capital had, in its documents, shown the requisite 5% level of WBE participation, but had secured an MBE level of only 5%, 10% under the recommended level. The DGS rejected First Capital's bid as non-responsive, and accepted American's bid.

First Capital then brought suit for injunctive relief, alleging that the state regulatory scheme as applied by the DGS creates a racial quota system in violation of the equal protection clause of the fourteenth amendment, a system which cannot survive the strict scrutiny demanded by the United States Supreme Court in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). The complaint also includes several pendent state law claims.

*Discussion*

The only relief being requested of the court at this juncture is a preliminary injunction, and the court will thus consider the merits of plaintiff's case only under the narrow standards for that type of relief. In *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223 (3d Cir.1987), the Third Circuit Court of Appeals enumerated the standards for issuance of a preliminary injunction:

> At the trial level, the party seeking a preliminary injunction bears the burden of producing evidence sufficient to convince the court that (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of relief; (3) granting preliminary relief will not result in even greater harm to the other party; and (4) granting preliminary relief will be in the public interest.

*ECRI*, 809 F.2d at 226 (citation omitted). Because the court does not believe that plaintiff has shown a reasonable probability of success on the merits, the injunction will not issue.

As a jumping off point, it is important to note that in *Associated Pennsylvania Constructors v. Jannetta*, 738 F.Supp. 891 (M.D.Pa.1990), this court ruled that the scheme created by the Pennsylvania Code

---

1. An initial solicitation and response was voided    by the DGS.

sections at issue here were facially valid. The court held that the scheme does not "require use of certain percentages of women and minorities but, rather, seek[s] to ensure no *current discrimination.*" *Associated Pennsylvania Constructors*, at 893 (emphasis in original).

Here, plaintiff argues that the DGS has created a strict system of racial quotas through the enforcement of the MBE and WBE participation levels as benchmarks in accepting or denying a bid. As evidence of this practice, plaintiff points to its own rejection letter dated January 3, 1991, which stated that plaintiff's bid was rejected as non-responsive because it "[f]ailed to achieve a commitment to MBE's at the established minimum participation levels." [2]

Defendant counters that plaintiff's bid was rejected as non-responsive to the requirements set out by the bid documents. The commitment sheet submitted by plaintiff along with other bid documents, according to defendant, did not contain the proper information so that the state could pass on the bid as non-discriminatory.

Two witnesses for the DGS, Ted Clements, Director of the Commonwealth's Office of Minority and Women Business Enterprises ("OMWBE"), and Jacquelyn Graves, a supervisor at the Contracting and Bidding Division of DGS, explained the procedures in evaluating bids and sending out responses to the bidders. All bids are sealed. When they are received by the DGS, they are forwarded to the OMWBE where the documents are analyzed by several officials, including Clements. Part of the examination performed by Clements and the other OMWBE officials includes comparing the amount of minority business solicited (as described in the solicitation sheet) versus the amount of minority business actually committed to (listed on the commitment sheet). If discrepancies exist between the figures, then the officials look for an adequate explanation in the commitment or solicitation sheets. For instance, the prices of the MBE might be non-competitive or the MBE might not have the proper equipment. If, however, the bidder has secured the minimum participation level of MBEs and WBEs, the bid is presumed responsive. According to Clements, the purpose for this exercise is not to guarantee a particular proportion of every contract goes to minority or woman-owned businesses, but instead to ensure that they are at least made part of the competitive bidding process. After the OMWBE analysis, the recommendations of the office are sent to the Contracting and Bidding Division in memorandum form. The reasoning within the memorandum is then to be merged into a form letter which is then sent to the disappointed bidder.

At the hearing, Clements explained that he had personally reviewed plaintiff's bid documents and rejected them as non-responsive. He found First Capital's submission to be non-responsive because neither the commitment sheet nor the solicitation sheet included any notes of explanation as to why First Capital had committed to smaller amounts of business from two minority owned suppliers than they had originally been quoted. Clements stated that if First Capital had supplied a suitable explanation for the discrepancy, then the bid may well have been considered responsive.

The court agrees that the bare statement of the January 3, 1991 rejection letter to First Capital, standing alone, intimated that First Capital's failure to reach the participation levels was the reason for the DGS's rejection of their bid. The court believes, however, that Clement's evaluation memorandum, not the letter, reflects the real explanation for the DGS's rejection of the bid: that the discrepancies between the commitment and solicitation sheets were inadequately explained, a procedure already found to be constitutional by this

---

**2.** Plaintiff also points out that its original bid had reached the necessary minority participation level because included within that bid was a quote from an asbestos removal company called His Three. His Three did not respond to plaintiff's second request for a quote, and thus could not be included as a committed MBE. The court finds that facts relating to the initial bidding for the job are irrelevant to the issue here, which focuses solely on the propriety of the DGS's denial of plaintiff's re-bid.

court in *Associated Pennsylvania Constructors.* Indeed, American, the successful bidder, committed to no MBEs and only 4.78% of the contract to WBEs. However, American's solicitation sheet reflected the reasons for not patronizing the minority or woman-owned businesses at the set levels. Moreover, from the documents submitted at the hearing, the court is satisfied that the quota-implying language used in the letter sent to First Capital was part of a form letter within the DGS computer system, and that the exclusion of additional explanatory language was an administrative oversight, not a reflection of DGS policy.[3]

Plaintiff also appears to contend that the DGS's explanation is a facade and that there is no written requirement that the bidder supply such explanations on the commitment sheet. At the hearing, however, Clements cited to the Special Requirements document entitled "Minority and Women Business Enterprise Participation," which was included among the documents in the invitation to bid package received by First Capital. At page SR–7 of that document, paragraph B(2)(a)(3) states that when a bidder fails to meet the minimum participation standard and "no quotations are received nor commitments made to MBE or WBE firms, the lack of quotation and/or commitments must be shown or explained on the GSMWBE–32 Commitment Sheet. Leaving the Commitment Sheet blank is not sufficient." The commitment sheet itself contains a similarly worded instruction. Plaintiff has offered no adequate explanation as to why its commitment sheet was not filled out in accordance with these rules.[4]

█ Plaintiff further argues that, even if the language in the rejection letters intimating that the rejection was due to not reaching a quota was inadvertent, the effect of such language is to intimidate contractors into religiously sticking to these figures themselves to ensure that their bids are not sorted out as non-responsive. While the court admits the logic of plaintiff's argument, and agrees that the language in the letter is misleading, there is no evidence in the record to indicate that this language caused any contractor to impose a voluntary set aside of business for MBEs or WBEs.

Thus, the court is satisfied that the procedures outlined in 4 Pa.Code § 68.101 were constitutionally applied in this case. The rejection letter, which alone would tend to show that the participation levels were being used as quotas, was adequately explained as an administrative glitch, and that quotas were not used in deciding whether to award the Cheney contract to First Capital, but that its bid was rejected as non-responsive. Accordingly, as plaintiff has failed to show a reasonable probability on the merit, plaintiff's motion for a preliminary injunction must be denied.

█

**3.** Previous rejection letters sent out by the DGS, along with the testimony of Graves and Clements, show that it was the practice of the DGS to provide additional information along with the stock language of the form letter, information which in this case would have cited the lack of explanatory language on First Capital's commitment sheet as the reason behind the rejection of the bid. In his testimony, Clements admitted that the letter is inconclusive, and did not provide all the information in the summary portion of the evaluation memo.

**4.** Plaintiff's president, Patricia Cumor, did testify that she did not commit to the minority suppliers for all the needs on the job because their prices were too high.