L.K. COMSTOCK & Co., INC., and LUIS ELECTRIC CORP., a Joint Venture, Appellant, v NEW YORK CONVENTION CENTER DEVELOPMENT CORP., Respondent.

First Department, May 7, 1992

## APPEARANCES OF COUNSEL

*Harvey J. Barnett* of counsel *(Michael S. Blazer, Harold Smith, Franklin E. Tretter, Eli S. Cohn* and *Howard A. Rosenstein* with him on the brief; *Barnett, Bornstein & Blazer, Ltd., Hinckley & Silbert, P. C.,* and *McDonough Marcus Cohn & Tretter, P. C.,* attorneys), for appellant.

*Morris Dershowitz* for respondent.

OPINION OF THE COURT

SMITH J.

The issue here is whether plaintiff's participation in a minority business enterprise plan and its failure to object to that plan for over 10 years constitutes a waiver on its part so that it is precluded from constitutionally challenging that plan now.

Plaintiff is a joint venture comprised of L.K. Comstock & Co., Inc. and Luis Electric Corp., electrical contracting companies. Defendant New York Convention Center Development Corporation (NYCCDC) is a subsidiary of the New York Urban Development Corporation (UDC). NYCCDC was created to facilitate the construction of what is now known as the Jacob K. Javits Convention Center located in Manhattan.

This is a breach of contract action based on three agreements between the plaintiff and NYCCDC for electrical contracting work entered into between 1981 and 1985 and allegedly costing over $52 million. Plaintiff admits receiving over $46 million of this amount. As a result of additional work allegedly required by NYCCDC, plaintiff also seeks delay and inefficiency damages of $18 million.

NYCCDC, in answer to the complaint, asserted 15 affirmative defenses, 14 of which were allegedly based upon specific provisions in the contracts at issue, and contended that no moneys were due to plaintiff. Moreover, NYCCDC also asserted five counterclaims for $30 million in damages sounding in breach of contract, breach of warranty and fraud and for $50 million in punitive damages.

Subsequently, plaintiff sought partial summary judgment dismissing only defendant's fourth counterclaim. In essence, the fourth counterclaim alleges, *inter alia,* that the plaintiff agreed to provide for participation by minority businesses in the construction project but failed to achieve the established goals and, because of this failure, plaintiff is not entitled to a portion of the moneys which might otherwise be due under the agreements.[1]

Related to the fourth counterclaim are the fifteenth affirmative[2] defense and the fifth counterclaim.[3] These portions of the answer set forth sections of the contracts which, *inter alia,* specified the MBE participation goals, how compliance with the goals was to be calculated, and provided liquidated damages for

noncompliance with the goals. The fifteenth affirmative defense essentially alleges that the action is barred because plaintiff knowingly made false representations regarding its compliance with the MBE goals to induce NYCCDC to award the contracts to plaintiff and, as such, was in breach of contract. Based upon these claims of fraud and breach of contract, the fifth counterclaim seeks punitive damages and alleges, *inter alia*, that plaintiff's complained-of actions caused it to be awarded the NYCCDC contracts and profit thereby at the expense of NYCCDC and the public.

Plaintiff's complaint does not reference or challenge the Minority Business Enterprise (MBE) program set forth in the fifteenth affirmative defense and the fourth and fifth counterclaims. Before the motion court, plaintiff sought dismissal of the fourth counterclaim, "the sole subject" of its motion for partial summary judgment. As grounds thereof, plaintiff contended (1) that, chiefly relying upon *Richmond v Croson Co.* (488 US 469 [1989]), the MBE program was an unconstitutional racial quota, violative of the Equal Protection Clause of the 14th Amendment; (2) that the fourth counterclaim sought a penalty and not liquidated damages; and (3) that NYCCDC had exceeded its legislative mandate (vis-à-vis the MBE program).

In *Croson (supra)*, a Minority Business Utilization Plan which required prime contractors who were awarded construction contracts by the City of Richmond, Virginia, to subcontract at least 30% of any contract to Minority Business Enterprises was rejected, partially on the grounds that no showing was made of prior discrimination by the City of Richmond in the awarding of contracts, no showing was made of specific acts of discrimination by the construction industry, and the plan was not narrowly drawn to remedy the effects of past discrimination.

In opposition to the motion, NYCCDC argued that triable issues of fact existed with respect to what "good faith" efforts plaintiff made to comply with the MBE program and the precise amount of damages defendant may be entitled to on the fourth counterclaim. Specifically, it was alleged that NYCCDC was induced to award the contracts at issue to plaintiff based upon the false representation that Luis Electric Corp. (Luis) was a bona fide MBE. It was also alleged that defendant would be entitled to liquidated damages if Luis ceased to be a bona fide MBE after being awarded the con-

tracts. In support of these contentions, NYCCDC submitted several newspaper articles reporting on State and Federal investigations into the borrowing activities of Luis. They purportedly revealed that a reputed associate, Irwin "Fatman" Schiff, was a silent partner with a controlling interest in Luis. Defendant further asserted that Mr. Schiff, shot to death execution-style on August 8, 1987, was Caucasian and therefore not a "minority." To the extent that his ownership interest caused Luis's nonminority equity participation to be over 51%, Luis was not a bona fide MBE. Therefore, if true, plaintiff either accepted the NYCCDC contracts with false MBE certifications or those certifications became false during contract periods. Defendant alleged that further support for its contention was found in the Supreme Court, New York County, case of *First Inter-County Bank v Roadworks Indus.* (NYLJ, Nov. 4, 1988, at 22, col 4), where Schiff was identified as a principal of Luis.[4]

With respect to the constitutional challenge, defendant submitted the affidavit of John Flateau, former Senior Vice-President in charge of Affirmative Action for UDC. The affidavit set forth his knowledge and experience in the areas of affirmative action, minority business development, equal employment opportunity in New York State, and specifically of racial discrimination within the New York State and City construction industries. The affidavit also set forth the statistical basis for and the process by which the MBE goals were adopted by UDC and applied to its subsidiary, NYCCDC.

In 1980, UDC commissioned two independent studies of minority representation in the construction trades in New York State and City. The Boone Young Report and the Mobicentrics Report resulted therefrom. The Boone Young Report was an extensive demographic analysis of minority business participation in the New York State and City construction and architectural/engineering industries. The Boone Young Report identified "enormous disparities" within these industries which it concluded were attributable to discrimination. Such disparities were found in evaluating minority representation in the general population and the construction industry labor force, and minority-owned construction firms in the industry and their average gross revenues as compared to nonminority construction firms.

The Mobicentrics Report also examined New York State and City populations and work force and construction labor force populations. It found that minorities were underrepre-

sented at all levels in the industry except as laborers, the least skilled and lowest paid level. Minority representation was also examined with respect to metal crafts, carpenters and construction crafts within the industry. NYCCDC challenged plaintiff's contention that these reports were either "conclusory, statistically invalid" or insufficient to withstand strict scrutiny and alleged that it could demonstrate the contrary at trial.

NYCCDC also relied upon a 1980 memorandum by Darryl Greene, Esq., UDC Vice-President for Affirmative Action, to Richard Kahan, UDC President and Chief Executive Officer. Mr. Greene related, *inter alia,* his personal experience and knowledge of discrimination against minorities in the construction industry in New York State and City and his belief that increased minority participation would be achieved only by specific affirmative action requirements. He concluded by recommending that, "[n]umerical goals for [minority] participation in any particular project or contract should be established after giving consideration to the scope of work to be performed, the availability of qualified minority businesses and workers to perform such work and other related factors."

As to plaintiff's contention that the MBE program exceeded defendant's legislative mandate, defendant relied upon its enabling legislation and its investigation and analysis of the issue prior to promulgating the guidelines and goals in dispute. Specifically, UDC's enabling legislation, section 6254 (11) of McKinney's Unconsolidated Laws of New York (Urban Development Corporation Act [Act] § 4 [11]; L 1968, ch 174, § 1, as amended), states in pertinent part: "The corporation [UDC] shall take affirmative action in working with construction firms, contractors and subcontractors, labor unions and manufacturing and industrial firms, to the end that residents of areas in which projects are to be located shall be afforded priority in the construction work on projects of the corporation, and in business operations of tenants and occupants of industrial projects undertaken by the corporation." NYCCDC, as a subsidiary of UDC, was created pursuant to section 6262 (1) of McKinney's Unconsolidated Laws of New York (Act § 12 [1]), which states in pertinent part: "The corporation [UDC] shall have the right to exercise and perform its powers and functions through one or more subsidiary corporations."

On the issue of whether the liquidated damages clause constituted a penalty, NYCCDC contended that there were triable issues of fact as to how much additional money was

paid to plaintiff based upon its false MBE certification, which also presented triable issues of fact.

The motion court denied plaintiff's motion for partial summary judgment dismissing the fourth counterclaim. The motion court held that issues of fact existed with respect to whether the liquidated damages clause constituted an unenforceable penalty or an enforceable contract provision and regarding the allegations concerning the principals of Luis. As to the MBE participation program, the motion court found that for 10 years plaintiff "participated in the scheme" without objection, which arose "[o]nly when evidence developed that there may have been fraud and undue influence in implementing the goals". The motion court also concluded that the MBE program was supported by statistical evidence establishing past discrimination against Blacks and Puerto Ricans in the New York construction industry, that the program was sufficiently narrowly tailored in that it applied only to one venture and waivers or modification were available upon demonstrating a good-faith effort at compliance, and that the program was limited to those segments of the industry (including electrical trades) where there were qualified minority contractors ready and able to bid. The motion court acknowledged that the program may have been over-inclusive with respect to Eskimos, Aleuts and persons of Asian descent but that since this was not challenged at the inception of the program, it "cannot be a basis for breaching an agreed upon contractual provision." Finally, the contention that defendant had exceeded its legislative mandate was rejected. This appeal followed.

On appeal, the parties essentially raise the same arguments made before the motion court. Plaintiff also disputes that there has been a waiver of the right to challenge the constitutionality of the MBE program.

■ For the reasons set forth below, we affirm the denial of plaintiff's motion for partial summary judgment dismissing the fourth counterclaim.

First and foremost, this action must be viewed in its proper context. Plaintiff commenced this action to enforce three construction contracts and to recover moneys allegedly due pursuant to those contracts. The contracts date back as far as 1981. Plaintiff has received over $46 million pursuant to these contracts. In the complaint, plaintiff does not seek to have any provision of the contracts declared void or unconstitutional.

The complaint does not allege that plaintiff was denied a public works project or the opportunity to bid on such a project on a discriminatory basis. The complaint does not reference or challenge the MBE program contained in the contracts. This is also true with respect to the liquidated damages clause of the MBE program. The complaint does not allege any injury either actually sustained by or contemplated to be sustained by plaintiff as a result of the MBE program. Plaintiff's challenge to the MBE program has arisen solely in response to defendant's allegation that the contracts plaintiff seeks to enforce were awarded based upon plaintiff's misrepresentation of compliance with the MBE program. Therefore, to avoid paying damages that may or may not have resulted from its failure to comply with the MBE program which allowed plaintiff to participate in the NYCCDC project, plaintiff seeks to nullify the entire program after 10 years of participation and over $46 million in payments.

Based upon these facts, plaintiff's position is untenable and its constitutional challenge to the MBE program precluded. Contract and equitable considerations compel the conclusion that plaintiff has waived the right to challenge the constitutionality of the MBE program at this time. In each contract, the MBE program set forth specific minority participation goals and possible consequences for the failure to satisfy that obligation. Plaintiff agreed to the contracts. Thus, the waiver of any constitutional rights was clear *(see, Fuentes v Shevin,* 407 US 67 [1972] [under certain conditions a constitutional right may be waived by contract but that waiver must be clear]).

An analysis of the waiver of constitutional rights by contract includes determining whether that waiver was voluntary, knowing and intelligent. In *Overmyer Co. v Frick Co.* (405 US 174, 187 [1972]), the Supreme Court held, *inter alia,* that in the execution and delivery of a contract containing a cognovit judgment provision, the party voluntarily, knowingly and intelligently waived rights it otherwise possessed to prejudgment notice and hearing and that it did so with full awareness of the legal consequences. Moreover, this contractual waiver would not be enforced if it was a contract of adhesion, there was great disparity in the parties' respective bargaining power, and there was no consideration for the waiver *(supra,* at 188). The record herein supports a finding of a voluntary, knowing and intelligent waiver of constitutional

rights based upon plaintiff's participation in the MBE program. The record is devoid of any evidence to the contrary.

Further support for concluding that there has been a waiver by plaintiff may be found in analogous cases. In *Shepherd v Mount Vernon Trust Co.* (269 NY 234 [1935]), plaintiffs held a joint account in the defendant bank. The bank was forced to close but it reopened under a reorganization plan, authorized by statute, that was consented to by the requisite number of depositors, creditors and stockholders and approved by the court. Plaintiffs refused to consent to the plan because it restricted the amount to be paid depositors. However, upon the bank's reopening, plaintiffs withdrew the full amount authorized under the plan. Plaintiffs sued for the balance of their account and alleged that the reorganization plan was unconstitutional. The dismissal of plaintiffs' complaint was affirmed because it was contrary to principles of fairness and justice to allow the action *(supra,* at 247). The court stated, "The plaintiffs cannot now successfully attack the plan of reorganization on constitutional grounds, *even if we should assume that the statute or plan is vulnerable to such attack; for the plaintiffs have already availed themselves of some of the benefits of that plan" (supra,* at 244; emphasis supplied).

In *Fahey v Mallonee* (332 US 245, 255 [1947]), the Supreme Court stated that it was an elementary rule of constitutional law that one cannot seek to retain the benefits of a law while attacking the constitutionality of one of its important conditions *(see also, United States v San Francisco,* 310 US 16, 29 [1940]). In *Fahey,* it was held that the plaintiff stockholders in that derivative action were estopped from questioning the validity of vital conditions of the act to which the corporation owed its existence *(supra,* at 256).

▮ Clearly, plaintiff herein has benefited financially from its participation in the MBE program and, by this action, seeks to maximize that benefit. As a joint venture between a nonminority firm and an alleged MBE, plaintiff is a creation of the MBE program. Plaintiff now seeks to invalidate the entire program, essentially after the fact, so that damages set forth therein cannot be exacted for violation of the MBE program.

Plaintiff contends that the MBE program herein was a burden and not a benefit. As such, waiver and estoppel principles would be inapplicable. Two cases relied upon by plaintiff on this issue require comment. In *Kadrmas v Dickinson Pub. Schools* (487 US 450, 455-457 [1988]), the Supreme Court held

that plaintiffs were not estopped from challenging the constitutionality of a North Dakota statute that permitted school districts to charge a fee for transporting children to their public schools where, after initiation of the suit and an adverse court ruling, the plaintiffs executed contracts with the school district to provide that service. The court found that because the statute imposed a burden, plaintiffs' subsequent agreement to the challenged fees did not constitute a waiver of their rights *(supra)*. *Kadrmas* is distinguishable in that those plaintiffs challenged the statute from the outset, they entered into a contract after an adverse court ruling, and there was no apparent benefit under the statute.

In *Groves & Sons Co. v Fulton County* (920 F2d 752 [11th Cir 1991]), a MBE program was challenged on constitutional grounds by a contractor who lost a bid for an airport repair contract. The contractor alleged that but for the MBE program, under the Georgia low-bid statute, it would have been awarded the contract. The contractor sued for equitable relief and damages. The *Groves* court found the principles set forth in *Fahey v Mallonee (supra)* inapplicable because the MBE program was not designed to benefit non-MBE firms and they were in fact burdened by the program (920 F2d, *supra,* at 768). Unlike the case at bar, *Groves* was a direct constitutional challenge to a MBE program by an unsuccessful bidder. The significance of the fact that plaintiff herein was awarded the contract because of the MBE program is made clear by the *Groves* court's statement that, "[E]ven if the [MBE program] regulations were intended to benefit Groves and similar bidders, there has been no showing that Groves ever received any contract under the [MBE program]" *(supra,* at 768).

Based upon the foregoing, plaintiff's constitutional challenge to the MBE program is precluded by virtue of waiver and estoppel principles. Consequently, we need not and do not reach the issue of the constitutionality of the NYCCDC MBE program.

Nevertheless, it must be noted that *Richmond v Croson Co.* (488 US 469, *supra)* is clearly inapplicable to the facts here. In *Croson* and in other cases involving government construction contracts with set-aside provisions for minority enterprises, the challenge to those set-asides has come almost invariably from those who were unsuccessful bidders to the contracts and who thus sought to enjoin the minority set-aside programs prior to the commencement of the contract at issue *(see, e.g., Coral Constr. Co. v King County,* 941 F2d 910 [9th Cir 1991]

[plaintiff alleged that a bid was lost on a county guardrail construction contract because of unconstitutional MBE program; summary judgment to county reversed and case remanded for determination of whether consultant studies provided adequate factual justification to establish compelling government interest and whether causal relationship existed between program's geographical overbreadth and plaintiff's injury]; *Harrison & Burrowes Bridge Constructors v Cuomo,* 743 F Supp 977 [ND NY 1990] [injunction granted in suit by contractor to prevent State from enforcing minority set-aside provisions of State law; injunction denied as to State-administered Federal affirmative action program]; *General Bldg. Contrs. Assn. v City of Philadelphia,* 762 F Supp 1195 [ED Pa 1991] [injunction denied where contractor alleged bid on convention center construction contract was lost because of affirmative action plan, but causal connection between rejection of bid and plan was not established]; *First Capital Insulation v Jannetta,* 768 F Supp 121 [MD Pa 1991] [preliminary injunction denied to low bidder on asbestos removal contract because rejection was due to its nonresponsive bid and not MBE or WBE requirement]).

■ In light of our ruling with respect to the MBE program, the liquidated damages clause remains. We are satisfied that on this record there are triable issues of fact as to whether these damages constitute a penalty.

■ Finally, there is no merit to plaintiff's contention that NYCCDC exceeded its legislative mandate with the implementation of its MBE program.

Accordingly, the fourth counterclaim should remain.

Order, Supreme Court, New York County (Helen E. Freedman, J.), entered December 28, 1990, which denied the plaintiff's motion to strike the fourth counterclaim asserted in the defendant's answer, is unanimously affirmed, without costs.

END NOTES

1. The fourth counterclaim reads in pertinent part:

"104. That Article 29.5 of the contracts between NYCCDC and plaintiff provide as follows:

" 'Notwithstanding anything to the contrary in Article 4 or 5 of this Agreement, Owner [NYCCDC] may withhold from the Final Payment as liquidated damages for Contractor's [plaintiff's] failure to achieve the goal for MBE [Minority

Business Enterprise] participation in the Work a sum equalling the difference between (1) all sums which would have been paid to MBEs had Contractor achieved the goal for MBE participation in the Work set forth in this Agreement, and (ii) *[sic]* such sums actually paid to MBEs for the Work in accordance with this Agreement.'

"105. That pursuant to the contracts with NYCCDC, plaintiff was required to have a minimum of 20% of the total dollar value of all its work performed by a Minority Business Enterprise for the contract designated C-90014 and a minimum of 13% of the total dollar value of all its work performed by a Minority Business Enterprise for the contract designated C-90033 and that, in the event plaintiff failed to satisfy these obligations, NYCCDC was entitled to receive and/or retain from plaintiff as liquidated damages all sums which should have been paid to Minority Business Enterprises less any sums actually paid to Minority Business Enterprises by plaintiff for the Work required by the contracts.

"106. That upon information and belief, plaintiff included in its bid prices amounts related to the MBE participation requirements of the contracts.

"107. That plaintiff failed, refused, omitted and neglected to have the required percentage of its Work performed by a certified Minority Business Enterprise, in breach of its contracts with NYCCDC.

"108. That by reason of the foregoing, and the joint venture agreement and based on plaintiff's allegations regarding the agreed adjusted price for the two contracts, there is due and owing from plaintiff to NYCCDC as liquidated damages the sum of not less than $9,085,759.67, no part of which has been paid by plaintiff, though duly demanded."

2. The fifteenth affirmative defense reads in pertinent part:

"65. That Article 29.2 of the contract designated C-90014 between NYCCDC and plaintiff provides in relevant part as follows:

" '(a) Contractor shall achieve the goal of 20% Minority Business Enterprise participation in the Work.

" '(b) The goal for MBE participation in the conduct of the Work is expressed as a percentage equal to the total dollar value of the Work performed by MBEs divided by the Contract Price.'

"66. That Article 29.2 of the contract designated C-90033 between plaintiff and NYCCDC provides in relevant part as follows:

" '(a) Contractor shall achieve the goal of 13% Minority Business Enterprise participation in the Work.

" '(b) The goal for MBE participation in the conduct of the Work is expressed as a percentage equal to the total dollar value of the Work performed by MBEs divided by the Contract Price.'

"67. That Article 29.5 of the contracts between NYCCDC and plaintiff provide *[sic]* as follows:

" 'Notwithstanding anything to the contrary in Article 4 and 5 of this Agreement, Owner may withhold from the Final Payment as liquidated damages for Contractor's failure to achieve the goal for MBE participation in the Work a sum equalling the difference between (1) all sums which would have been paid to MBEs had Contractor achieved the goal for MBE participation in the Work set forth in this Agreement, and (ii) *[sic]* such sums actually paid to MBEs for the Work in accordance with this Agreement.'

"68. That pursuant to the mandate of the Legislature of the State of New York in creating NYCCDC and enacting laws in furtherance thereof, it was determined pursuant to Chapter 35, Laws of 1979, Section 5, in relevant part, that

" '(5) Any contract for construction with respect to the convention center shall be awarded in conformity with the provisions of section eleven of the New York State Urban Development Corporation Act [McKinney's Unconsol. Laws § 6261], and section one hundred thirty-five of the state finance law as referred to therein, provided that the determination by the development corporation of whether a bidder is "responsible" shall include (but need not be limited to) consideration, as set forth in the bidding documents, of the financial and organizational capacity of the bidder in relation to the magnitude of the contract, the record of performance of the bidder on previous work, the record of the bidder in complying with existing labor standards, maintaining harmonious labor relations and recognizing state and federally approved apprentice training programs, and the ability and willingness of the bidder to provide, and to commit to provide, for meaningful participation of minority group persons and business enterprise *[sic]* in the conduct of the work.'

"69. That pursuant to contract and statute, plaintiff was required to provide for meaningful participation of minority group persons and business enterprises in the conduct of its work and to achieve, at the very least, those minimum percentage MBE participation requirements set forth in the contracts with NYCCDC.

"70. That in breach of its contracts and in total violation and disregard of statutory law, plaintiff failed to provide for meaningful participation of minority group persons and business enterprises in the conduct of its work and failed to achieve those minimum percentage MBE participation requirements set forth in the contracts with NYCCDC.

"71. *That further, upon information and belief, plaintiff fraudulently induced NYCCDC to award it the two contracts heretofore described by representing that it would comply with the minority business enterprise participation requirements required by the contracts and imposed by statute.*

"72. *That further, upon information and belief, plaintiff made said representations with knowledge that they were false, that they were in violation of [the] statute, and that they were in breach of said contracts, all in an effort to induce NYCCDC to award said contracts to plaintiff.*

"73. That by reason of plaintiff's fraudulent and illegal acts and conduct and breach of its contracts regarding the participation of minority business enterprises in the conduct of its work, plaintiff is barred from maintaining this action and lacks the necessary capacity and standing to sue." (Emphasis supplied.)

3. The fifth counterclaim states in part:

"110. That plaintiff, in breach of its contracts and in total violation and disregard of statutory law, failed to provide for meaningful participation of minority group persons and business enterprises in the conduct of its work, despite its express representation to so provide.

"111. That plaintiff knowingly and intentionally made false representations for the express purpose of inducing NYCCDC to rely upon said representations and award contracts to plaintiff.

"112. *That plaintiff's false representations were knowingly made for the purpose of deceiving NYCCDC and securing*

*substantial monetary gain and profits from the award of said contracts.*

"113. That by reason of the foregoing, *plaintiff has wrongfully and illegally received substantial economic gain at the expense of NYCCDC, the State of New York, its taxpayers and the public at large.*

"114. That by reason of plaintiff's illegal and improper, fraudulent and reprehensible acts and conduct, and the public wrongs committed thereunder, plaintiff is liable to NYCCDC for punitive damages in the sum of not less than $50,000,000.00, no part of which has been paid by plaintiff." (Emphasis supplied.)

4. That decision, unrelated to the case at bar, stated as a matter of fact, "Luis Electrical Contractors Inc. ('Luis') [is] a company in which [Irwin] Schiff and Rabuffo were principals." (Supra, at 22, col 5.)

CARRO, J. P., MILONAS, ROSENBERGER and ELLERIN, JJ., concur.

Order, Supreme Court, New York County, entered December 28, 1990, which denied the plaintiff's motion to strike the fourth counterclaim asserted in the defendant's answer, is unanimously affirmed, without costs.